IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LUCIO FLORES-LOZA,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  2:09-cr-297 CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Defendant Lucio Flores-Loza ("Flores") moves the court to suppress all evidence seized during a search of Flores' vehicle.  Trooper Lars Gardner ("Trooper Gardner") stopped Flores for exceeding the speed limit.  After issuing a citation, returning Flores' documents, and bidding him a good day, Trooper Gardner started walking back to his vehicle.  After taking a few steps, he turned back to Flores' vehicle and asked Flores if he could ask him some additional questions.  Flores refused.  Trooper Gardner then started to walk back to his vehicle a second time.  Again, however, he stopped and turned back to question Flores further.  Trooper Gardner did not identify any additional facts that he learned after telling Flores he was free to go to support a reasonable suspicion to extend the stop.  Nevertheless, Trooper Gardner continued to detain Flores and asked Flores to sign a consent form allowing a search of his vehicle.  Flores signed the form and Trooper Gardner found a large quantity of methamphetamine during the search.  Flores moves to suppress this evidence on the grounds that the scope of the stop was unreasonably extended and that the consent to search was invalid.   The court agrees the detention and search were unlawful.  Accordingly, it

grants the motion to suppress.

## FACTUAL BACKGROUND

On the morning of May 10, 2009, Trooper Gardner stopped Flores for exceeding the speed limit on I-70, near Green River, Utah.  Flores was driving a two door, extended cab truck, with a hard shell over the bed of the vehicle.[1]  Trooper Gardner saw electrical cords, tools, and a duffel bag on the back seat of the vehicle, and noted that Flores was Hispanic.[2]  Flores told Trooper Gardner he was going to look for work in Denver, Colorado.[3]  Trooper Gardner asked for the vehicle registration and proof of insurance.  The registration listed Daniel Castillo as the registered owner, and the insurance card listed Jesus Castillo as the insured.[4]  Flores informed Trooper Gardner that he was friends with Jesus Castillo.[5]  Flores did not have the registered owner's contact information with him, and indicated he would have to call home to obtain it.[6]

As Flores provided the documents, Trooper Gardner testified that Flores was breathing quickly, his "carotid artery was pulsating very quickly," and his hands were "shaking very badly."[7] Based on Flores' nervousness, the limited amount of clothing in the back seat, different names on the registration and insurance documents, and the fact that Flores was Hispanic and not the owner

---

[1]  Hearing Tr., 11:7–20 (Docket No. 27).

[2]  *Id.* at 12:4–12, 54:14–18.

[3]  *Id.* at 13:22–25.

[4]  Registration Card (Plaintiff's Ex. 1); Evidence of Insurance (Plaintiff's Ex. 2).

[5]  Hearing Tr., 20:21–25 (Docket No. 27).

[6]  *Id.* at 21:4–9.

[7]  *Id.* at 13:4–8.

of the vehicle, Trooper Gardner suspected that Flores might be involved in criminal activity.[8]  He suspected that the vehicle might be stolen or that Flores "might be transporting a large amount of narcotics" because when people run narcotics they often use another person's vehicle to avoid losing their own vehicle.[9]

Consequently, Trooper Gardner checked the vehicle's VIN number against the number listed on the registration to make sure they matched.[10]  He then called into dispatch and requested a check on whether the vehicle was stolen.[11]  He further requested a check to determine whether the registration and Flores' drivers license were valid, and whether Flores had a criminal history.[12]  Dispatch reported that the vehicle had not been reported stolen, the registration and driver's license were valid, and Flores had no warrants for his arrest.[13]  Although the vehicle had not been reported stolen, Trooper Gardner knew from experience a stolen vehicle is not always reported in a database in a timely manner.[14]  Thus, the status report on the vehicle did not remove his suspicion that the vehicle might be stolen.[15]

---

[8]  *Id.* at 22:4–12, 23:1–5; 54:14–18.

[9]  *Id.* at 22:11–12; 22:17–23.

[10]  *Id.* at 23:7–10; 23:17–21.

[11]  *Id.* at 23:10–13.

[12]  *Id.* at 23:10–16; 24:6–7.

[13]  *Id.* at 26:18–22.

[14]  *Id.* at 27:9–16.

[15]  *Id.* at 27:21–23.

Trooper Gardner then completed the citation and returned Flores' documents to him.[16]  Upon

doing so, Trooper Gardner "noticed [Flores'] level of nervousness had not decreased."[17]  Based on

his experience, once someone is issued a ticket, the person's level of nervousness usually decreases

because the traffic stop is concluded.[18]  Because the level of Flores' nervousness did not decrease,

Trooper Gardner's suspicions continued.[19]

Trooper Gardner testified that he has been trained on when he may "properly detain an

individual."[20]  He testified that he knows "there is a difference between just a general suspicion and

a reasonable suspicion."[21]  Regarding reasonable suspicion, Trooper Gardner testified as follows:

> Q.    And you know that you can only detain a person as long as it
>        takes to investigate the suspected criminal activity.
> A.    Yes, sir.
> Q.    So if you do not have reasonable suspicion that a person is
>        involved in unlawful activity you must let that person go.
> A.    Yes, sir.
> Q.    But if you have reasonable suspicion that someone's involved in unlawful
>        activity you are trained to detain them while you investigate, right?
> A.    Correct.
>
>        . . . .
>
> Q.    And if you had reasonable suspicion that a person was
>        involved in unlawful activity you would do all you could to
>        investigate the basis of your suspicion.

---

[16]  *Id.* at 28:20–21; 29:2–5.

[17]  *Id.* at 29:11–12.

[18]  Hearing Tr., 29:14–16.

[19]  *Id.* at 29:24–30:8.

[20]  *Id.* at 47:2–4.

[21]  *Id.* at 47:5–9.

A.      Correct.
Q.      On the other hand, if you have reasonable suspicion that a
        person was involved in unlawful activity you would not let
        that person leave until you had investigated your suspicion,
        right?
A.       Correct.[22]

Nevertheless, Trooper Gardner told Flores to watch his speed, slow down, and that he "was

good to go."[23]  He then started to walk back to his patrol vehicle, past the back of Flores' vehicle.

Trooper Gardner testified about these events as follows:

A.      I advised him he was good to go, yes.
Q.      That was your exact quote, he was good to go.  You also told
        him to drive safely.
A.      Correct.
Q.      And you walked to the rear of the pickup truck didn't you?
A.      Correct.
Q.      You did this because, in fact, he was now free to go, wasn't he?
A.      Yes, sir.
Q.      He could have driven off during the time you were walking to
        the back of the pickup truck, couldn't he?
A.      Yes, sir.
Q.      And you wanted him to know he was free to go, didn't you?
A.      Yes, sir.[24]

Rather than continuing to his patrol vehicle, however, Trooper Gardner returned to the

passenger window of Flores' vehicle.  He asked Flores whether he could ask him more questions.[25]

---

[22]  *Id.* at 47:14–25; 48:18–49:1

[23]  Videotape, 8:56:08–14 (Plaintiff's Ex. A).

[24]  Hearing Tr., 56:13–57:3 (Docket No. 27).

[25]  Videotape, 8:56:28–30 (Plaintiff's Ex. A).

-5-

Flores said "No."[26]  Trooper Gardner asked again if he could ask him more questions.[27]  Flores said

"No" a second time.[28]  Trooper Gardner then queried, "It's okay, you don't want to answer any more

questions?"[29]  Flores said "No."[30]  Trooper Gardner next said, "You don't want to? . . . You okay?"[31]

When Flores said he was okay, Trooper Gardner said "Drive safely, okay?  Have a good day."[32]  He

then turned and started walking back to his patrol vehicle again.[33]  After taking only a couple of

steps, Trooper Gardner turned back to the passenger window and started to ask Flores a series of

questions about what type of work Flores did and whether he was carrying illegal drugs.  He testified

he did so because his suspicions were so high he could not leave without asking more questions.[34]

Eventually Trooper Gardner asked Flores if he could search his vehicle.  At no time did

Flores give verbal consent to search his vehicle.[35]  Unfortunately, Flores is not fluent in English and

Trooper Gardner knows little Spanish.  Thus, it is unclear how much of the conversation Flores

understood when Trooper Gardner was questioning him about drugs and whether he could search

---

[26]  *Id.* at 8:56:30–32; Hearing Tr., 57:15–19 (Docket No. 27).

[27]  Videotape, 8:56:40–42 (Plaintiff's Ex. A).

[28]  *Id.* at 8:56:42–44.

[29]  *Id.* at 8:56:45–48.

[30]  *Id.* at 8:56:47–48.

[31]  *Id.* at 8:56:48–59.

[32]  *Id.* at 8:57:00–03.

[33]  *Id.* at 8:57:04–11.

[34]  Hearing Tr., 33:14–16 (Docket No. 27).

[35]  *Id.* at 59:7–9.

Flores' vehicle.  What is known is that after questioning him for a time, Trooper Gardner told him "un momento" or "wait a minute."[36]  Trooper Gardner then retrieved a consent to search form from his patrol vehicle that was written in Spanish.  He gave the form to Flores and asked if Flores could read it.[37]  While Flores was reading the form, Trooper Gardner asked him again if he could search the truck and whether Flores understood the form.[38]  After taking about one-and-a-half minutes to read a three sentence form, Flores eventually said "no problema."[39]  Trooper Gardner interpreted this to mean that Flores understood the form and what it was asking.[40]  He therefore asked him to complete the form and sign it.[41]  Flores printed his name on the form, but did not complete the other parts of it.[42]  Trooper Gardner then conducted a search of the vehicle and found a large amount of methamphetamine.

At the hearing on the motion to suppress, Flores presented evidence that he only has a third-grade education.[43]  He also presented expert testimony that the consent form was poorly translated into Spanish.  It contains non-words, misspellings, and may imply that Flores was giving consent for

---

[36]  *Id.* at 60:9–12.

[37]  *Id.* at 60:18–19; Videotape, 9:00:09–22 (Plaintiff's Ex. A).

[38]  Hearing Tr., 61:3–4 (Docket No. 27);Videotape, 9:00:34–45 (Plaintiff's Ex. A).

[39]  Hearing Tr., 37:5–13 (Docket No. 27); Videotape, 9:00:08–9:01:46 (Plaintiff's Ex. A).

[40]  Hearing Tr., 61:5–9 (Docket No. 27); Videotape, 9:01:48–52 (Plaintiff's Ex. A).

[41]  Hearing Tr., 61:10–12.

[42]  Consent to Search Form (Plaintiff's Ex. 3).

[43]  Audiotape of Interview, 5:16–30 (Plaintiff's Ex. B).

the vehicle to be registered or recorded rather than searched.[44]  Due to the alleged extended detention and lack of proper consent, Flores moves to suppress the evidence found in his vehicle.

## ANALYSIS

### I.      STANDARD FOR A MOTION TO SUPPRESS

"The government has the burden of demonstrating that the seizure 'it seeks to justify on the basis of reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"[45]  The court, however, "must avoid unrealistic second-guessing of police officers' decisions in this regard."[46]  It should "allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[47]  Once the government produces evidence to support the reasonableness of the officers' actions, the burden then shifts to the defendant to prove the evidence should be suppressed.[48]

### II.     SEARCH AND SEIZURE

#### A.      Applicable Law

"[A] traffic stop is a seizure for purposes of the *Fourth Amendment*."[49]  The *Fourth*

---

[44] *See* Hearing Tr., 75:4–78:14 (Docket No. 27).

[45] *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

[46] *Id.* (quotations and citations omitted).

[47] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations and citations omitted).

[48] *See United States v. Clarkson*, 551 F.3d 1196, 1200 (10th Cir. 2009) (citation omitted).

[49] *United States v. Wisniewski*, 192 Fed. Appx. 749, 754 (10th Cir. 2006) (citations omitted).

*Amendment* precludes, however, only unreasonable searches and seizures.[50]  Thus, the legality of a stop or subsequent detention depends upon its reasonableness.  Ordinarily, a person "must be allowed to proceed on his way" once the purpose of the initial stop is concluded.[51]  An officer may extend the stop, however, if "(1) the driver voluntarily consents to it; or (2) during the course of the stop, the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity."[52]

When evaluating whether an officer had reasonable suspicion, "[t]he evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*."[53]  "[R]easonable suspicion may be premised upon information which is less reliable than that required to establish probable cause."[54]  Indeed, "the level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause."[55]  It may also be premised on conduct which is not illegal by itself but, in combination with other facts, gives rise to an articulable suspicion.[56]  A mere "unparticularized suspicion or hunch," however, "is insufficient to support

---

[50]  U.S. Const. amend. IV.

[51]  *Wisniewski*, 192 Fed. Appx. at 754.

[52]  *United States v. Velazquez*, No. 08-3318, 2009 U.S. App. LEXIS 22743, at *5–6 (10th Cir. Oct. 16, 2009) (citation omitted).

[53]  *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007) (quotations and citation omitted).

[54]  *Wisniewski*, 192 Fed. Appx. at 755 (citation omitted).

[55]  *United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009) (quotations, citation, and alteration omitted).

[56]  *Wisniewski*, 192 Fed. Appx. at 755 (citations omitted).

reasonable suspicion."[57]

Here, Flores does not contest that Trooper Gardner was justified in stopping him for speeding.  He does contend, though, that Trooper Gardner unlawfully extended the scope of the stop when Flores refused to consent to additional questioning.  The court agrees.

### B.    Continued Detention

#### 1.    Consensual Encounter

As stated above, once the purpose of a stop has ended, the detention may continue if the driver consents to additional questioning.  Here, Trooper Gardner concluded the stop by returning Flores' documents, issuing the citation, informing Flores he was "good to go," and stepping away from the passenger window.  Trooper Gardner then re-engaged in conversation with Flores by returning to the passenger window and asking Flores if he could ask him more questions.  Flores refused consent multiple times.  These clear and repeated refusals negate that Flores gave consent to be detained further for questioning.

#### 2.    Reasonable Suspicion

Because Flores did not consent to the additional questioning, Trooper Gardner had to have reasonable suspicion to continue the detention.  In *United States v. Guzman*, the Tenth Circuit set forth the following standard for determining whether an initial traffic stop was legal:  "whether under the same circumstances a reasonable officer would have made the stop in the absence of [an] invalid purpose."[58]  Subsequently, the court found the standard unworkable.  It therefore "adopt[ed] a new

---

[57] *Id.* (quotations and citation omitted).

[58] *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (quoting *United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir. 1988)).

standard . . . for examining the constitutionality of a traffic stop."[59]  Under the new standard the focus is on "whether *this particular officer* had reasonable suspicion that this particular motorist violated" the law.[60]  Although the new standard in *Botero-Ospina* addressed whether an initial stop was valid, the same reasoning applies to a continued detention once the purpose of the initial stop has concluded.  Thus, while the court uses an objective standard for determining reasonable suspicion, it is based on whether Trooper Gardner had reasonable suspicion to continue the detention.[61]

Trooper Gardner testified that he knows when an officer has reasonable suspicion the officer may continue a detention.  He also testified that if he had reasonable suspicion he would not let a person leave until he had completed his investigation.  At times, when an officer does have reasonable suspicion, he may nevertheless engage in a ruse, for investigatory reasons, where he leads a person to believe he is free to go when in fact he is not.[62]  Such a ruse does not negate the validity of a continued detention when the officer has reasonable suspicion or probable cause.

When Trooper Gardner informed Flores he was "good to go," however, it was not part of a ruse.  Instead, Trooper Gardner testified that Flores *was free to go* and he wanted him to know that he was free to go.  Because Trooper Gardner knew he could continue to detain Flores if he had reasonable suspicion, but testified that Flores was truly free to go after he received the citation, this shows this particular officer did not have reasonable suspicion when he extended the scope of the

---

[59]  *Id.* at 787.

[60]  *Id.* (emphasis added).

[61]  The court notes an exception to this rule exists under the "fellow officer" or "collective knowledge" doctrine, but that exception is inapplicable in this case.

[62]  *See United States v. Chavez*, 534 F.3d 1338, 1348 (10th Cir. 2008) (citation omitted); *White*, 584 F.3d at 943.

stop.[63]   Rather, based on Trooper Gardner's experience and specialized training, it shows the cumulative information available to him resulted only in an unparticularized suspicion or hunch. The court therefore concludes that the continued detention of Flores was unlawful.

## III.   STANDING

The government contends that Flores cannot challenge the search of the vehicle because he lacks standing.  The government bases its contention on the fact that Flores was not the owner of the vehicle and no evidence was presented to show he had permission from the owner to drive the vehicle.  The United States Supreme Court has stated "'that *Fourth Amendment* rights are personal in nature.'"[64]  Consequently, to have standing to challenge a search one must have both a subjective and objective expectation of privacy.[65]  When one "lawfully possesses or controls property," that person likely will "have a legitimate expectation of privacy."[66]  Although one does not have to provide legal documentation to show his possession is lawful, "the proponent must at least state that he gained possession from the owner *or someone with the authority to grant possession*."[67]

Here, Flores provided proof of insurance that listed Jesus Castillo as the insured.  "An automobile insurance policy, like other forms of insurance, must be supported by an insurable

---

[63] The court credits Trooper Gardner's truthfulness, and acknowledges the challenges present in determining if reasonable suspicion exists.

[64] *United States v. Arango*, 912 F.2d 441, 444 (10th Cir. 1990) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)).

[65] *Id.* at 445.

[66] *Id.* (quotations and citation omitted).

[67] *Id.* (citation omitted).

interest in the named insured."[68]  Flores, therefore, had a reasonable expectation that Jesus did have

authority to grant possession of the vehicle.  Flores informed Trooper Gardner that Jesus was his

friend, and he said that he could call home to obtain the contact information for the owner of the

vehicle.  Trooper Gardner never asked whether the insured or owner actually gave Flores permission

to drive the vehicle.  This may be inferred from Flores' statements, though, and the fact that there

is no evidence that the vehicle was ever reported stolen.  The court thus concludes that Flores has

standing to challenge the search.

## IV.    CONSENT TO SEARCH

        Although Flores' detention was unlawful, he did print his name on a consent to search form

prior to Trooper Gardner searching his vehicle.  Consequently, the court must address whether this

consent was valid.  Flores challenges the consent on the following two grounds.  First, the consent

was tainted by the unlawful detention.  Second, the consent was invalid because the form contained

multiple errors that made it unclear what the purpose of the form was and whether Flores could

understand it because he only had a third-grade education.  The court concurs that the consent was

tainted by the unlawful detention.

        "When a consensual search is preceded by a *Fourth Amendment* violation, as in this case, the

government must prove" two things.[69]  It must prove that the consent was voluntary based on the

totality of the circumstances,[70] and it must "establish a break in the causal connection between the

---

        [68]  *Nationwide Mut. Ins. Co. v. Smith*, 654 S.E.2d 837, 840 (S.C. Ct. App. 2007) (citation
omitted).

        [69]  *Melendez-Garcia*, 28 F.3d at 1053.

        [70]  *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

illegality and the evidence thereby obtained."[71]  In other words, the government must "demonstrate that any taint of an illegal search or seizure has been purged or attenuated" because "the illegal seizure may affect the voluntariness of the defendant's consent."[72]  The following three factors are relevant in making this determination: (1) "the temporal proximity between the police illegality and the consent to search;" (2) "the presence of intervening circumstances;" and (3) "the purpose and flagrancy of the official misconduct."[73]

Here, while Trooper Gardner gave Flores time to read the consent form, there was no other break between the illegal detention and the consent.  The Tenth Circuit has "repeatedly held that consent is not voluntary when in such close temporal proximity to an illegal detention."[74]  With respect to the second factor, the court finds a lack of intervening events between Trooper Gardner's questioning and Flores printing his name on the consent form to show the taint of the illegal detention has been purged.  Rather, Flores presented uncontroverted evidence that the consent form was poorly translated and that he only had a third grade education.  Although Trooper Gardner did not know at the time that Flores had only a third grade education, the length of time required for Flores to read three sentences should have indicated at least a concern about whether Flores understood the form and was voluntarily consenting to the search.  Thus, no intervening events purged the taint of the illegal detention.

---

[71]  *Id.* (quotations and citation omitted).

[72]  *Id.* at 1054 (citation omitted).

[73]  *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

[74]  *United States v. Pina-Aboite*, 109 Fed. Appx. 227, 237 (10th Cir. 2004) (quotations, citations, and alteration omitted).

The third factor focuses on the purpose and flagrancy of the official misconduct. It does not appear to the court that Trooper Gardner engaged in flagrant misconduct. Indeed, Trooper Gardner was justified in making the initial stop and some factors were present to cause suspicion about Flores' activity. Trooper Gardner, however, did not develop reasonable suspicion based on these factors. Yet, "he detained [Flores] with a quality of purposefulness, . . . in the hope that something might turn up."[75] Despite Flores' repeated refusals to answer more questions, Trooper Gardner continued his questioning. He also directed Flores to wait a minute while he retrieved the consent form. Although Flores appeared to struggle to read the form, and he did not complete the form as instructed, but only printed his name, Trooper Gardner accepted this as superseding Flores' repeated verbal refusals to be detained longer. Considering the totality of the circumstances, the court concludes that Flores' consent was not sufficiently attenuated from the illegal detention so as to be voluntary. Accordingly, the evidence obtained from the illegal detention must be suppressed.

Based on this conclusion, the court need not address whether the consent form itself was so defective that it could not support consent.

## CONCLUSION

The court concludes that Trooper Gardner improperly extended the scope of the stop. The court further concludes that Flores' consent to search was invalid. The court, therefore, GRANTS Flores' Motion to Suppress.

---

[75] *Id.* at 239 (quotations and citation omitted).

DATED this 11th day of January, 2010.

BY THE COURT:

Clark Waddoups
United States District Judge